IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 16-179 |
| MATTHEW MCTISH | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, the president of an engineering firm, conspired in a pay-to-play scheme with the mayors of Reading, Pennsylvania, and Allentown, Pennsylvania, paying bribes in the form of campaign contributions in exchange for the offer of lucrative municipal engineering contracts. The government asks the Court to consider all of the factors set forth below and to impose a non-custodial sentence, consisting of 5 years' probation with the first 12 months on house arrest, and a substantial fine.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006); *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006)).  See also *United States v. Smalley*, 2008 WL 540253, *2 (3d Cir. Feb. 29, 2008) (stating that the *Gunter* directive is consistent with later Supreme Court decisions).   In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision.   *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc).   The failure to properly calculate the advisory guideline range will rarely be harmless error.   *United States v. Langford*, 2008 WL 466158, *8-11 (3d Cir. Feb. 22, 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence.   "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it."   *Cooper*, 437 F.3d at 329.   See also *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Schweitzer*, 454 F.3d 197, 205-06 (3d Cir. 2006).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, and submits that a non-custodial

2

sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

I.     BACKGROUND

    A. **City of Reading**
      **Crim. No. 13-791**
      **Count 1 (Conspiracy)**
      **Counts 2, 3, 5, 6, 7, 9 (Bribery - soliciting)**

Between January 2012 and July 2015, Mayor Spencer solicited multiple bribes in the form of contributions to his re-election campaign from the engineering firm McTish Kunkel & Associates (MKA), in exchange for Spencer's agreement to engage in the official acts of awarding municipal engineering contracts, including the River Road Extension contract, the 2nd & Penn Complete Streets contract, and the 19th Ward Pump Station contract. These explicit *quid pro quo* agreements were established through the testimony of trial witnesses, including the defendant, who engaged in *quid pro quo* conversations with Spencer; Sam Ruchlewicz, who worked on the mayor's campaign, solicited contributions from McTish for the mayor, and recorded conversations with both McTish and the mayor; Eron Lloyd, the mayor's Special Assistant for Sustainability and campaign treasurer; and Ralph Johnson, the Director of Public Works, to whom the mayor indicated that the defendant was the preferred vendor with regard to the 2nd & Penn Complete Streets and 19th Ward Pump Station contracts.

Exhibits admitted at trial, including numerous checks and recorded conversations, established the following overt acts. On April 21, 2014, the defendant made a $1,500 campaign contribution to Mayor Spencer, and at the time, they discussed potential engineering contracts in Reading, including the multi-million-dollar River Road Extension project. On October 9, 2014, the defendant made a $1,250 campaign contribution to Spencer, at which time MKA had just bid on the River Road Extension contract. This contract ultimately was not awarded to MKA.

On December 10, 2014, Spencer arranged a meeting for the defendant with the new Director of Public Works, Ralph Johnson, to discuss MKA doing future work for the city. During that meeting, Spencer called on speaker phone to confirm that the two were meeting. Two weeks later, on December 22, 2014, the defendant caused his brother, David McTish, to make a $1,125 contribution to defendant's re-election campaign. The next day, December 23, 2014, Spencer spoke to Ralph Johnson about awarding the 2nd & Penn Street project to MKA. On March 2, 2015, Spencer caused the City of Reading to award the 2nd & Penn contract to MKA, after granting the defendant special access to Ralph Johnson to discuss and modify his firm's proposal. This contract was valued at approximately $7,000. On April 11, 2015, three days after being advised that he could move forward with the 2nd & Penn project, the defendant attended a fundraiser for Spencer and gave him a $1,500 campaign contribution.

On April 30, 2015, the defendant told Spencer that he may be able to secure campaign contributions from AECOM, with which MKA was partnering on a proposal for the 19th Ward Pump Station contract, and they discussed AECOM and MKA getting that contract, valued at $472,000 (with the subcontract value to MKA of approximately $92,000). Spencer and Ruchlewicz also agreed to show a competitor's proposal to the defendant so that MKA could underbid the competitor. On May 15, 2015, shortly before the primary election, in exchange for the "inside track" on the awarding of the 19th Ward Pump Station contract, the defendant caused two AECOM representatives to contribute $500 apiece, for a total of $1,000, to Spencer's re-election campaign. Shortly after the election, Spencer instructed his Chief of Staff, Eron Lloyd, to ensure that defendant McTish was "taken care of" with respect to the 19th Ward Pump Station contract. On June 4, 2015, at Spencer's direction, Eron Lloyd met with the defendant. At that

meeting, while MKA's bid on the 19th Ward Pump Station was pending, the defendant provided a $500 check to the Reading PAC.  As Ralph Johnson testified at trial, Spencer clearly indicated to Johnson that Spencer wanted MKA (and AECOM) to receive this contract, which they ultimately did.[1]

      **B.**      **City of Allentown**
             **Crim No. 17-390**
             **Count 1 (Conspiracy)**
             **Count 10 (Soliciting a bribe)**

Like Mayor Spencer, Mayor Edwin Pawlowski of Allentown sought to maximize his campaign contributions.  Pawlowski ran for mayor multiple times, Pennsylvania Governor, and later, the United States Senate.  Between January 2012 and July 2015, like Mayor Spencer, Pawlowski engaged in the explicit *quid pro quo* exchange of lucrative municipal engineering contracts for campaign contributions, embroiling numerous vendors in his pay-to-pay scheme.

The defendant testified that his experience with Pawlowski was that when he met with Pawlowski, the defendant would talk about the work his firm liked to do, and Pawlowski would talk about upcoming Allentown work, his plans, and his fundraising campaign, all in the same conversation. Ruchlewicz and Fleck also drew the same connection for him between getting work in Allentown and making campaign contributions to the Mayor. Pawlowski seemed knowledgeable about his work and made the defendant feel encouraged that he would have an opportunity to do work.  Pawlowski would then slide right into how he needed the defendant's help making a campaign contribution for the campaign. The defendant said that he had this type of conversation with Pawlowski more than once and had similar conversations with Ruchlewicz.

---

[1] MKA was later terminated from this contract.

The defendant said that he made campaign contributions in Allentown to remain competitive in public engineering contracts. He felt pressure to give primarily to Mayor Pawlowski. In his view, there was a relationship between getting work and making campaign contributions, and he felt that doing nothing at all for Pawlowski's request for money for running for governor would upset Pawlowski. He did not believe that he could get work in Allentown without making donations to Mayor Pawlowski.

The explicit *quid pro quo* that led to the defendant's April 27, 2015 donation to Pawlowski was established at trial through the testimony of McTish, Ruchlewicz, numerous checks, and audio recordings of conversations among McTish, Ruchlewicz, and Pawlowski.  In December 2014, the defendant learned about a new project on Chew Street in Allentown from Sam Ruchlewicz, the mayor's campaign manager. Ruchlewicz told him about the project on December 4, 2014 and later in the same conversation asked him for a donation to Mary Ellen Koval, the City Controller.  The next day, Ruchlewicz told Pawlowski that Koval and Dougherty had found McTish a project (Chew Street) and that Pawlowski should hit McTish up for Pawlowski's holiday party. Defendant McTish acknowledged making a $1,000 contribution to Koval on December 5, 2014, and a $1,125 contribution to Pawlowski on December 19, 2014, and his brother making a contribution of $1,125 to Pawlowski on December 19, 2014 at his behest. On April 27, 2015, the defendant met Pawlowski at a restaurant. Pawlowski asked the defendant to raise $21,600 for his Senatorial campaign. After Pawlowski left, the defendant told Ruchlewicz that the mayor and he had discussed bridges. The defendant said that the mayor and he had discussed the type of work that MKA did.  The defendant told Ruchlewicz that Pawlowski had said that if he could become U.S. Senator, "that would be very good for my

6

business." As a result, the defendant contributed $2,500 to Pawlowski on July 1, 2015. He said that he made campaign contributions in Allentown to remain competitive in public engineering contracts, and he felt pressure to give to the mayor.

## II. SENTENCING CALCULATION

### A. Statutory Maximum and Minimum Sentence.

Count One carries a maximum of 5 years' incarceration, a period of supervised release of 3 years, a $250,000 fine, and a $100 special assessment.

### B. Sentencing Guidelines Calculation.

Both the plea agreement and the U.S. Probation Office calculated the Sentencing Guidelines as follows:

| | |
|---|---:|
| Base offense level, 2C1.1(a)(2) | 12 |
| More than one bribe, 2C1.1(b)(1) | +2 |
| Payments of more than $15,000 but less than $40,000, 2B1.1(b)(1)(C) | +4 |
| Offense involved a public official, 2C1.1(b)(3) | +4 |
| Acceptance of responsibility, 3E1.1 | -3 |
| Adjusted offense level | **19** |

In light of a Criminal History Category of I, this results in a Guidelines range of 30 to 37 months' incarceration.

## III. ANALYSIS

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that this Court should consider the calculation of the advisory guidelines as set forth in the Presentence Investigation Report, the plea agreement, review all other factors, and impose a

non-custodial sentence of 5 years' probation with the first 12 months under house arrest, and a substantial fine.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007).  As will be discussed later, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

The nature of this offense is serious.  The defendant conspired with both the Mayor of Reading and the Mayor of Allentown to circumvent the fair bidding process put in place by those cities in order to unfairly beat out his competitors by bribing the mayors. Such a scheme adversely impacts not only the other parties bidding on a given contract, but the citizens, who

expect that the engineering contracts to improve their streets and bridges will be awarded in a fair manner to ensure the best work possible. It is difficult to call this conduct anomalous when the defendant engaged in similar conduct repeatedly with two mayors. The defendant has, however, indicated remorse for his conduct.

The Court must also consider the nature of the offender. The defendant is 58 years old and resides in Orefield, Pennsylvania with his wife of 30 years. PSR at ¶¶ 57, 67. They have two adult daughters who have college degrees. *Id.* at ¶ 70. The defendant has a bachelor's and master's degree in civil engineering from the University of Pittsburgh. *Id.* at ¶ 66. He obtained his engineering license in 1986 and it was set to expire in 2017. *Id.* at ¶ 81. Upon graduation from college, the defendant worked as an engineer in Pittsburgh for a few years and then relocated back to the Allentown area in 1990, where he began to work for MKA, a family engineering firm started by the defendant's father. *Id.* at ¶¶ 58, 82-83. Because the defendant stepped down as president of MKA following these charges, his brother, David McTish, is now the president. *Id.* at ¶ 62. The defendant has worked for MKA for his entire career, and has a net worth of approximately $11,400,000. *Id.* at ¶ 85. The defendant receives severance payments from MKA. *Id.* at ¶ 83. The defendant described a pleasant upbringing and has no history of alcohol or drug abuse or mental health issues, other than anxiety related to these charges. He is involved in a significant number of professional associations, community groups, and volunteer organizations.

The Court should impose a sentence that will protect the public from further crimes of the defendant. Given that the defendant left his position and is debarred from renewing his engineering license for the next three years as a result of these charges, this is of minimal

9

concern.   In addition, the defendant is nearing retirement age.

Additionally, the Court should fashion a sentence that will provide adequate punishment, "reflect the seriousness of the offense and promote respect for the law."   18 U.S.C. § 3553(a)(2).   The recommended sentence also should afford adequate deterrence to the defendant and to others who would commit a similar offense.   *Id.* Clearly, crimes such as the one in which this defendant engaged not only adversely impact competitors economically, but deeply impact the public's trust in its government, and must be deterred.

Finally, in terms of avoiding unwarranted sentencing disparity, as the Court is aware, this investigation implicated the administrations of both the City of Reading and the City of Allentown, with the respective mayors of those cities engaging in substantially similar pay-to-play schemes to maximize campaign contributions utilizing the same campaign consultants.   A number of individuals have been sentenced in these related cases:

Edwin Pawlowski, the former Mayor of Allentown who was found guilty on multiple counts of bribery, mail and wire fraud, and false statements by a jury on March 1, 2018, was sentenced to 15 years' incarceration.

Scott Allinson, Esq., his co-defendant, was convicted by the same jury for offering a bribe to Mayor Pawlowski and sentenced to 27 months' incarceration.

Francisco Acosta, former Reading City Council President who pled guilty to conspiracy to commit bribery, was sentenced to 24 months' incarceration.

Rebecca Acosta, former President of the Reading School Board who pled guilty to conspiracy to solicit a bribe from Mayor Spencer, and whose suggested sentencing guidelines range was 18-24 months' imprisonment, entered into a "C" plea for 18 months' imprisonment.

James Hickey, Esq., who pled guilty to one count of honest services mail fraud and one count of honest service wire fraud for offering bribes to public officials in both Reading and Allentown, and whose suggested sentencing guidelines range was 18-24 months' imprisonment, entered into a "C" plea for 18 months' imprisonment.

Garrett Strathearn, former Finance Director for the City of Allentown who pled guilty to conspiracy to commit bribery and testified at trial against Pawlowski, received a sentence of 6 months' house arrest and 5 years' probation, pursuant to a cooperation plea agreement.

Eron Lloyd, former Special Assistant for Sustainability for the City of Reading, who pled guilty to conspiracy to commit bribery and testified at trial against Spencer, received a sentence of 5 years' probation, the first 6 months of which included home confinement, and a $7,500 fine, pursuant to a cooperation plea agreement.

Dale Wiles, Esq., former Assistant City Solicitor for the City of Allentown who pled guilty to conspiracy to commit mail and wire fraud and testified at trial as a defense witness for Pawlowski, received a sentence of one day of incarceration and 3 months' home confinement, pursuant to a cooperation plea agreement.

Francis Dougherty, former Managing Director of the City Allentown who pled guilty to conspiracy to commit mail and wire fraud and testified at trial against Pawlowski, received a sentence of 3 years' probation, pursuant to a cooperation plea agreement.

Mary Ellen Koval, former City Controller for the City of Allentown, who pled guilty to conspiracy to commit honest services fraud, received a sentence of 2 years' probation and a $5000 fine, pursuant to a cooperation plea agreement.

Patrick Regan, Esq., who pled guilty to conspiracy to commit mail and wire fraud and had a suggested sentencing guidelines range of 0-6 months' imprisonment, received a sentence of 2 years' probation.

## V.   **CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court take into account the Guidelines calculation by the Probation Office, the calculation set forth in the plea agreement, the Section 3553(a) factors, and impose a non-custodial sentence of 5 years' probation, with the first 12 months to be served on house arrest, and a substantial fine.

Respectfully submitted,

LOUIS D. LAPPEN
Deputy United States Attorney


   /s/Michelle L. Morgan
MICHELLE L. MORGAN
ANTHONY J. WZOREK
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

      I certify that on this day I caused a copy of the Government's Sentencing Memorandum to be served by electronic filing, and/or first-class mail, addressed to:

Laurel Gift, Esq.
Schnader Harrison Segal & Lewis LLP
120 Fifth Avenue
Suite 2700
Pittsburgh, PA   15222
lgift@schnader.com

                                      */s/ Michelle L. Morgan*
                                     MICHELLE L. MORGAN
                                     Assistant United States Attorney

Dated:  April 9, 2019